MOXIE NERVE FOOD CO. OF NEW ENGLAND v. MODOX CO. et al.

(Circuit Court, D. Rhode Island. February 20, 1907.)

1. TRADE-MARKS AND TRADE-NAMES — SUIT FOR INFRINGEMENT — BURDEN OF PROOF.

A complainant, seeking the aid of a court of equity in protection of his rights in a proprietary medicine, should be required as a part of his affirmative case to allege and prove that his preparation is what it purports to be, and is represented to the public to be, there being no presumption that such representations are true upon which a court can act.

2. SAME—SECRET PREPARATION.

While the proprietor of a secret preparation is entitled to protection of his trade secret, yet to the extent that he has revealed or represented the character or composition of his preparation to the public he has waived secrecy, and there is no hardship in requiring him to prove the truth of such representations to a court of equity whose aid he invokes for its protection.

3. SAME—RIGHT TO RELIEF IN EQUITY—FRAUDULENT REPRESENTATIONS TO PUBLIC.

Complainant manufactured and sold in bottles, a liquid called "Moxie Nerve Food" or "Moxie," which was represented to the public by the labels and wrappers to have been prepared "from a simple sugar cane like plant grown near the equator," discovered by a Lieutenant Moxie, and to be a nerve food which had recovered brain and nervous exhaustion; also paralysis, softening of the brain, locomotor ataxia, and insanity, when caused by nervous exhaustion. In a suit for an injunction restraining infringement of the trade-mark under which the preparation was sold and unfair competition, the bill did not allege that such representations were true, nor that the preparation contained such ingredient or the

properties so claimed for it; and no evidence was introduced to show that it contained any ingredient which warranted the name of "nerve food," or to show a reasonable basis for a belief that the statements as to its curative powers were true. On the other hand, defendant introduced the evidence of physicians and chemists who made analyses of the preparation and of a former employé of complainant, which established affirmatively a very strong probability that the statement that the liquid was a preparation from a plant such as described was pure fiction, and that it was merely root beer, containing no nerve food or other curative agent, except perhaps a small amount of a bitter principle such as gentian or cinchona. *Held*, that under such state of the evidence, complainant was not entitled to the protection of a court of equity even as against undoubted infringement and unfair competition.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 94.]

4. SAME.

Where a proprietary preparation purchased and used largely as a mere beverage was also falsely and fraudulently represented by its manufacturer to contain valuable medicinal ingredients, a court of equity cannot afford protection to any part of its business against infringement of trade-mark or unfair competition.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trade-Marks and Trade-Names, § 94.]

In Equity. On final hearing.

Oliver Mitchell, Robert Cushman, James A. Bailey, Jr., and Roberts & Mitchell (Charles D. Woodberry, of counsel), for complainant.

Charles A. Wilson and George H. Huddy, Jr., for defendants.

BROWN, District Judge. This is a bill in equity brought by the Moxie Nerve Food Company of New England, manufacturers of a liquid known as "Moxie Nerve Food" or "Moxie," against the Modox Company and others, manufacturers of a beverage called "Modox," charging that the defendants have infringed the complainant's trademark rights, imitated its trade-name and goods, and in various ways have been guilty of unfair competition. The defendants contend that the complainant has been guilty of such false representations to the public that, under the principles set forth in Worden v. California Fig Syrup Co., 187 U. S. 516, 23 Sup. Ct. 161, 47 L. Ed. 282, it is barred from the right to seek the aid of a court of equity.

Before considering the defendants' specific charges of fraud, it is proper to inquire whether the complainant has made out a case for equitable relief. In Moxie Nerve Food Co. of New England v. Holland (C. C.) 141 Fed. 202, this court referred to the language of the Supreme Court in Deweese v. Reinhard, 165 U. S. 386, 390, 17 Sup. Ct. 340, 341, 41 L. Ed. 757:

"The right, whatever it may be and from what source derived, must be not only one not protected by legal title, but in and of itself appealing to the conscience of the chancellor. A court of equity acts only when and as conscience commands, and if the conduct of the plaintiff be offensive to the dictates of natural justice, then, whatever may be the rights he possesses and whatever use he may make of them in a court of law, he will be held remediless in a court of equity."

It is incumbent upon the complainant to move the conscience of the chancellor. It is shown, and is not denied, that the complainant's article "Moxie" or "Moxie Nerve Food" is a harmless beverage which

for many years has had a very large sale. It also appears that it is offered to the public as a "Nerve Food," or "food for the nervous system," and as a cure for nervous disorders; and that there is a public demand for the article as a cure for nervous disorders.

The trade-mark which the complainant desires to protect was registered in the Patent Office in September, 1885, upon a statement and declaration by Dr. Augustin Thompson:

"This trade-mark I have used continuously in my business since April 1, 1885, and the particular description of goods is a liquid preparation charged with soda for the cure of paralysis, softening of the brain, and mental imbecility, and called the 'Moxie Nerve Food.' It is comprised in the class of medical compounds."

Upon the label accompanying the declaration was the statement:

"Moxie Nerve Food. Has not a drop of medicine, poison, stimulant, or alcohol in its composition; but is a simple starchy plant grown in South America, and the only positive nerve food known that can recover brain and nervous exhaustion, and loss of manhood at once unaided. It has cured paralysis, softening of the brain, and mental imbecility," etc.

It also appears that, at the time of the filing of the bill, Moxie was represented to the public as a nerve food or a food for the nervous system, and as a preparation containing an ingredient of remarkable curative powers, as will appear from the following copy of the label affixed to the bottles:

More Palatable if Served Ice Cold.                    Keep in Cool Place.

Moxie Nerve Food.

Trade-Mark Registered.

A Food for the Nervous System, also a Delicious Beverage.

Contains Not a Drop of Poison, Stimulant, or Alcohol.

It is prepared from a simple sugar cane like plant grown near the equator. It was lately discovered by Lieut. Moxie, who placed his discovery in the hands of Dr. Augustin Thompson who has demonstrated its value as a food for the nervous system.

It has proved itself the only harmless and effective nerve food known to science and has recovered brain and nervous exhaustion, also paralysis, softening of the brain, locomotor ataxia and insanity, when caused by nervous exhaustion. It nourishes the nervous system, gives a durable solid strength without stimulation or reaction, creates a vigorous, healthy appetite, removes fatigue from mental and physical overwork and brings refreshing sleep at night. Does not interfere with the action of vegetable medicines.

The genuine is put up only in bottles of this shape, and is never drawn from soda fountains.

Moxie Nerve Food Co. of New England,

Sole Proprietors and Manufacturers,

Boston, Mass.                                        Branch, N. Y. City.

The wrapper of the Moxie bottle, furthermore, contains many statements as to curative virtues in "helpless cases of paralysis." The bill alleges:

"That the beverage 'Moxie,' * * * is a meritorious and useful article well esteemed for its tonic action and its useful and remedial effects under certain conditions and diseases, and that it is recognized by reputable members of the medical profession as a meritorious preparation, and is and has been by them prescribed when indicated, and public institutions such as hospitals, homes for consumptives and the aged and infirm, and the like, have been at their request supplied with 'Moxie' for the use of the inmates."

A comparison of the allegations of the bill and the actual representations made to the public as to the character of Moxie reveals an important discrepancy. It is the duty of a complainant seeking relief in a court of equity to present his case fully and fairly in his bill. The complainant, in seeking protection for its trade-mark, seeks protection for the business associated with the trade-mark. The trade-mark and the business are inseparable. Paul on Trade-Marks, 136. A complainant in equity, therefore, should show fully and fairly what is the business which he is conducting under the trade-mark. He cannot aid his case by omitting material facts as to the true nature of his business.

In McMullen v. Hoffman, 174 U. S. 639, 656, 19 Sup. Ct. 839, 846, 43 L. Ed. 1117, it was said:

"'It is a maxim in our law that a plaintiff must show that he stands on a fair ground when he calls on a court of justice to administer relief to him.'"

In Moxie Nerve Food Co. of New England v. Holland (C. C.) 141 Fed. 202, 204, it was said, "The statements upon the label or wrapper of a patent medicine bottle do not prove themselves." The statements upon the bottles are mere recitals. They prove what representations are made by the complainant to the public. They do not prove the truth of the representations. These recitals are proof only that they are recitals. Murphy v. Packer, 152 U. S. 398, 14 Sup. Ct. 636, 38 L. Ed. 489; Herron v. Dater, 120 U. S. 464, 7 Sup. Ct. 620, 30 L. Ed. 748.

In the Holland Case above cited, it was queried whether it would not be reasonable for a court of equity to hold that a complainant seeking to protect his proprietary rights as the owner of a patent medicine should produce legal evidence that it is in fact what it purports to be. Upon a further consideration of this point, I am of the opinion that the complainant, according to the ordinary principles of equity pleading and procedure, should be required, as a part of its affirmative case, to show that its preparation is what it purports to be. If a complainant seeks protection in the sale of bottled goods, he should be willing to swear that his bottles contain what he represents to the public that they contain, and that his goods are in fact what they are sold for. If a complainant in a bill in equity should allege, "I am selling to the public under a certain trade-mark an article which I represent to the public as fig syrup," such a bill, in my opinion, should be demurrable on the ground that the complainant has no right to protection in a mere business of making representations to the public, but only in a bona fide business of selling an article for what it is in fact. A court of equity should not extend protection to a business of selling medicine for paralysis or other serious diseases simply upon proof that the preparation is a harmless beverage with some slight tonic properties. Missouri Drug Co. v. Wyman (C. C.) 129 Fed. 623, 629.

The complainant's affirmative case affords no evidence upon which the court can find that its preparation is in fact what it is represented to be. We are asked to extend protection to the complainant upon presumptions in its favor. If this court should act upon the presump-

tion that this liquid is a preparation "from a simple sugar cane like plant grown near the equator," of remarkable value as a food for the nervous system, and as a cure for paralysis and other serious diseases, it would, in my opinion, depart from the ordinary rules which require allegation and proof. While fraud is not presumed, the truth of a mere allegation is ordinarily not to be presumed, but must be established by sworn evidence.

Courts of equity have frequently extended to the proprietors of patent medicines and like preparations privileges not extended to other litigants. They have assumed the truth of incredible or doubtful statements made by patent medicine vendors, without requiring them to make allegations to the court substantially similar to those made to the public, and have protected businesses which were neither presumptively nor in fact entitled to protection. Instances may be found where a complainant has received protection from a court of equity while making most incredible and preposterous statements to the public as the basis of his business. Is there any reason why a court of equity should act upon the presumption that a patent medicine vendor, or the vendor of a preparation offered to the public with statements as to wonderful ingredients and marvelous curative properties, states the truth upon his bottles and labels? Eminent jurists have acted upon the contrary presumption. In Williams v. Williams, 3 Merivale, 157, 15 Jurist, 794, Lord Eldon said: "Upon general principles, I do not think the court ought to struggle to protect this sort of secrets in medicine." Other cases to the same general effect are referred to in the opinion in Worden v. California Fig Syrup Co., 187 U. S. 527, 23 Sup. Ct. 161, 47 L. Ed. 282.

While this may be an extreme position, it is no more extreme than the cynical view that, despite extravagant and apparently unfounded statements, patent medicines should prima facie be regarded as property entitled to protection. In Worden v. California Fig Syrup Co., 187 U. S. 530, 23 Sup. Ct. 165, 47 L. Ed. 282, is cited with apparent approval the remark of Lord Chancellor Westbury:

"That he could not receive it as a rule, either of morality or equity, that a plaintiff is not answerable for a falsehood, because it may be so gross and palpable that no one is likely to be deceived by it," etc.

But why, in dealing with patent medicines, should a court of equity proceed upon general presumptions? A court of equity, when invoked to protect a business, cannot avoid a fair examination of the character of the business. Of the truth or untruth of certain representations or statements a court may take judicial notice. The ordinary rules as to judicial notice undoubtedly could be properly applied to preparations whose statements were on their face too preposterous or incredible. In many cases, however, the truth or untruth of representations cannot be determined upon the principles of judicial notice. A court should not, of course, take judicial notice that all patent medicines or secret preparations are fraudulent and lack merit, and refuse relief on this ground. It by no means follows, however, that it is required to presume that representations to the public are prima facie true. Ordinarily, those things of which a court does not take judicial notice must be proved.

In the present case, I find in the complainant's proof no sufficient reason for belief that this article is in fact what it is represented to be, either as to ingredients or curative value. I think that I cannot take judicial notice that the representations are untrue. The statements seem to be improbable. They cannot be ignored. And should relief be extended to the complainant, it would be with decided misgivings whether the court was not protecting a business of selling root beer under false representations that it contains an ingredient which is a cure for nervous disorders and serious diseases.

To apply the rule that a complainant must allege fairly and fully what his business is, and produce proof substantially supporting his allegations, should not require of the complainant the allegation and proof of the minute particulars of his business; but it should, I think, require a complainant who asserts that he has an article which is good as a beverage, and is also good as a cure or medicine because of certain ingredients, to make proof substantially to the extent of his general representations to the public. The proprietor of a secret preparation may justly claim protection of a trade secret, but to the extent of his representations to the public secrecy is waived; and there is no hardship in requiring a complainant who has stated certain things to the public as truths in order to promote the sale of his goods to state the same things as truths to the court, and prove them as truths, in order to secure equitable relief. The right to preserve a trade secret does not carry with it a general right to have one's bare word or unsworn statement accepted in a court of equity, or excuse a failure to prove the truth of what is published to the public. To the extent that a manufacturer of goods chooses to reveal their character and composition to the public—to that extent he waives the right of secrecy in a court of equity.

If it is not incumbent upon a complainant to prove something more than that he is representing his goods to the public in a certain way under a certain trade-mark, a court of equity, by ingenuously assuming the truth of what vendors tell the public about their goods, particularly goods of the patent medicine class, will indulge in a presumption not entertained by ordinary persons of intelligence, and which is contrary to that public experience which has resulted in the enactment by Congress of laws for the protection of the public against unscrupulous statements in relation to a very large number of articles in whose preparation there is an opportunity for adulteration, substitution, or secret fraud.

A presumption in favor of a complainant may be grounded on general experience, probability of any kind, or merely on policy and convenience. It is very doubtful if a presumption in favor of this complainant can rest on either of these grounds. I see no reason why, in the absence of averment and proof, this court should assume that Moxie is a preparation from a sugar cane like plant which has remarkable properties as a nerve food.

A complainant must by allegations and proof show that he is entitled to relief. Knox v. Smith, 4 How. (U. S.) 298, 317, 11 L. Ed. 983. The allegata and the probata must reciprocally meet and conform to each other. Harrison v. Nixon, 9 Pet. (U. S.) 503, 9 L. Ed. 201.

It seems to have been assumed in the argument that the burden rests upon the defendants to show with a high degree of certainty that the complainant's preparation is not what it purports to be. The record in this case well illustrates the practical inexpediency of supporting a complainant's case by a presumption of the truth of what he has not alleged to be true. If, as a fact, the complainant is selling root beer as a medicine for paralysis, etc., and can rely upon an artificial presumption that it is not, it can continue to do so with the assistance of a court of equity, and enjoin all defendants who have not the financial means to secure evidence in the very difficult task of proving a negative. If it be the fact, this complainant can easily prove that its liquid does contain the important ingredient which gives it remarkable qualities as a nerve food, and it can prove what it alleges to the public without fear that a court of equity will require it to disclose what it has chosen to keep secret. This court has so decided upon an interlocutory application in this case.

The question, where rests the burden of proof that Moxie is a preparation of a plant of remarkable virtue in nervous disorders? is one of great importance in this case. If the complainant does not offer affirmative proof, it runs what Mr. Wigmore terms "the risk of non-persuasion" of the court. If it may rely upon a presumption that it is not guilty of fraud, it should not rely upon a presumption that the court will assume its numerous statements to be true.

From the nature of this case, as well as of all cases involving a trade-mark upon goods, whose exact character can be known only to the manufacturer, but which are put forth with specific statements to induce the public to purchase them, the burden of proof as to the truth of the statements should rest upon the manufacturer. A chancellor should not be required to assume on the bench what he would not believe without proof when off the bench. Proof should be required from that person within whose knowledge the fact rests. Selma, Rome, etc., Railroad v. United States, 139 U. S. 560, 567, 568, 11 Sup. Ct. 638, 35 L. Ed. 266. There should be no such technical application of rules concerning presumptions or the burden of proof as to relieve a complainant from the obvious duty of satisfying the court that his goods are what they purport to be and what he represents them to be.

The complainant's attitude on the argument is substantially this: It is true that we represent this article as a preparation of a plant which has remarkable virtues in nervous disorders, but we do not propose to prove that it is what we represent it to be. We are entitled to the protection of a court of equity unless the defendants can prove that it is not, and the burden of proof is obviously altogether too heavy for the defendants to sustain.

The natural contempt of the chancellor for a fraudulent imitator who sets up the defense that he is imitating only a fraud apparently has often led the courts to treat with leniency a complainant who seeks protection for a valuable business built largely upon misrepresentation. It is quite true that the defense of unclean hands comes with ill grace from a rival manufacturer who is a fraudulent imitator whose hands are equally unclean. Siegert v. Gandolfi (C. C. A., 2d Circuit, De-

cember, 1906), 149 Fed. 100. But this, as it seems to me, is entirely aside from the merits of such a defense. It is not a question of grace. The validity of such a defense is well established. Worden v. California Fig Syrup Co., 187 U. S. 516, 23 Sup. Ct. 161, 47 L. Ed. 282. As the courts should not, in such cases, take into consideration the attitude of the defendant (187 U. S. 529, 23 Sup. Ct. 164 [47 L. Ed. 282]), so they should not take it into consideration when discussing the question of the burden of proof.

"It is a clear rule, laid down by courts of equity, not to extend their protection to persons whose case is not founded in truth." 187 U. S. 529, 530, 23 Sup. Ct. 165 (47 L. Ed. 282).

But how determine if a complainant's case is founded in truth? The rule is simple. Let the complainant state fully the real case, and support it by proof. The representation upon the label of a package is a material part of the vendor's business, and no undue hardship or inconvenience will result to an honest vendor if he is required to prove the truth of his label as he is required to prove the truth of any other material fact. This rule, I am aware, may prove exceedingly embarrassing to many vendors of patent medicines, but only to those who are guilty of misrepresentation and deceit. It need not prove embarrassing to one who wishes to keep a trade secret, for he need only forbear publishing what he does not care to prove.

In Worden v. California Fig Syrup Co., 187 U. S. 527, 23 Sup. Ct. 164 (47 L. Ed. 282), it was said that, in the absence of legislation, "courts cannot declare dealing in such preparations to be illegal, nor the articles themselves to be not entitled, as property, to the protection of the law."

I find in this opinion, however, no authority for relieving patent medicine vendors from the ordinary requirement that a complainant must affirmatively make out his right to relief, or for extending to them a presumption that what they have stated to the public is to be accepted as true by a court of equity without the support of sworn testimony.

I am of the opinion that this complainant has not made out a case for equitable relief, for the reason that it has failed to show the substantial truth of the representations made upon its labels and wrappers as to the ingredients and curative powers of Moxie in nervous disorders.

If it is wrong to refuse to extend to the complainant a presumption that its representations are true, it is yet very clear that a presumption of this class, if allowed to supply the place of fact, cannot stand against established facts. Fresh v. Gilson, 16 Pet. 327, 10 L. Ed. 982; Lincoln v. French, 105 U. S. 614, 26 L. Ed. 1189. The defendants' evidence is more than sufficient to overcome any mere presumption of the truth of the complainant's representations. This evidence will, however, be considered in connection with the defendants' contention that they have affirmatively established the defense of unclean hands, and of fraudulent representations to the public.

The complainant's representations to the public, which seem important on the issue of fraud, relate to the origin, ingredients, and curative powers of Moxie. The label states:

"It is prepared from a simple sugar cane like plant grown near the equator. It was lately discovered by Lieut. Moxie, who placed his discovery in the hands of Dr. Augustin Thompson who has demonstrated its value as a food for the nervous system."

The wrapper says:

"A little insignificant weed revolutionizing the habits of the world.

"We hereby agree to give any person $10,000, if they can show their preparations contains any Moxie, or if they can produce any of the plant, or its beneficial results.

"Moxie is compounded from well-known flavors, and the richest predigested nerve food ever discovered, by one of the most successful old physicians in New England."

"No representations can be more material than that of the ingredients of a compound which is recommended and sold as a medicine. There is none that is so likely to induce confidence in the application and use of the compound, and none that, when false, will more probably be attended with injurious and perhaps fatal consequences." Fetridge v. Wells, 13 How. Pr. 385, quoted in Worden v. California Fig Syrup Co., 187 U. S. 531, 23 Sup. Ct. 165, 47 L. Ed. 282. See, also, Perry v. Truefitt, 6 Beav. 66.

The defendants have offered in evidence advertisements inserted in the Lowell Morning Times by Dr. Augustin Thompson in February, 1885, in part as follows:

"From South America.

"On the Pacific side, in South America, the Indians grow a plant something like our rhubarb from which they make a decoction like our tea and coffee. This is their national drink. From its use they are able to undergo great fatiguing exertions without the ordinary result. It seems to be a nerve food instead of a medicine, as its use leaves no reaction or nervousness. * * * One of our prominent physicians is about to introduce it here and it will soon be on sale by the grocers and apothecaries, cheap enough that all may use it. * * * It will be called the 'Bolivian Nerve Food,' or 'Moxie Appetizer.' It builds an appetite by building the nervous system, which governs the functions of the body. Will be ready by March 3d."

The next advertisement, in March 1885, was in part as follows:

"South America Again to the Front.

"Last week we called your attention to that plant from South America lately introduced by Lieut. Moxie as a nerve food. His attention was first called to it from its general use by the natives, and singular action on the nervous system, while he was traveling in Bolivia. Through information obtained from him, it has been brought to Lowell and thoroughly tested for three months."

Medical and chemical experts say that these descriptions are suggestive in part of coca—"erythroxylon coca"— described by one witness as a stimulating substance not unlike the extract of tea.

In the bulletins of the Bureau of American Republics (printed by the government) appears, in the handbook on Bolivia, Vol. 4, p. 42, a reference to "coca," "erythroxylon coca"—

"the dry leaves of which are a highly stimulating narcotic, and are chewed by the Bolivian and Peruvian Indians, by travelers in the Upper Andes, and by the Bolivian soldiers, when in the field, just as betel is used by the inhabitants of the East Indies."

The complainant's statement that the preparation contains not a drop of stimulant, as well as other statements, and the results of chem-

ical analysis, negative the use of coca. It is nevertheless highly probable that the author of these advertisements was influenced by knowledge of this stimulant used by the Bolivians when he called his preparation "Bolivian Nerve Food," and wrote his account of the "national drink." That there is another Bolivian plant which has such points of resemblance to coca, and is yet so different, and which forms the curative agent in Moxie, does not seem highly probable.

The evidence raises serious doubts as to Lieut. Moxie, the discoverer. The existence of Lieut. Moxie can hardly be regarded as a trade secret. No one but Dr. Thompson seems to have known about him, so far as this record discloses. The defendants' reference to the existence in Bolivia of a tribe of Indians known as "Moxas" or "Moxos" (Cent. Dict. & Cyc. [Ed. of 1900] Vol. 9, p. 696; Enc. Brittanica, Vol. 12, p. 825) suggests the possibility that the lieutenant's name "Moxie" is also of Bolivian origin, and that Lieut. Moxie and the sugar cane like plant are both derivatives from literature concerning Bolivia. Were it not for the statement concerning the discoverer, it would seem to have been natural to name a Bolivian nerve food after a Bolivian Indian tribe, the Moxas or Moxos. We may conceive, of course, that by some remarkable coincidence of names a Lieut. Moxie was traveling among the Moxas Indians when he made his discovery, but this does not seem highly probable.

It is by no means necessary to infer that Moxie Nerve Food was named either from the Moxas tribe of Indians or from Lieut. Moxie. Moxie is said by the defendants to be a botanical name, and they have introduced in evidence a box labeled "Moxie," which a botanical druggist of Lowell, Mass., says contained a drug which he had in his shop before Moxie Nerve Food was put on the market by Dr. Thompson, and which was called by the druggist "Moxie." There is also evidence as to the "Moxie berry" (see Plant Names, Scientific and Popular, A. B. Lyons, M. D., Detroit, Mich.); but this is not Dr. Thompson's plant either in quality or habitat. But wherever Dr. Thompson may have found the name "Moxie," there remains a strong suspicion that Lieut. Moxie got his name from Dr. Thompson.

According to the complainant's brief, the Moxie business was established in 1884 by Dr. Augustin Thompson, a homeopathic physician of Lowell, Mass. The defendants show that Dr. Thompson had taken a mortgage upon a tonic beer factory in Lowell, and subsequently took possession of the property in satisfaction of his debt, and continued the same business. The "Moxie Nerve Food" was apparently the result of variations of or additions to the formula for ordinary root or tonic beer, so-called.

The complainant has proved that Moxie has been the same in composition from the beginning. Upon a label adopted by the complainant since the beginning of this suit it is described as a "bitter tonic beverage." While there is evidence that, upon analysis, Moxie shows evidences of containing gentian and cinchona, and while Dr. Tuttle, the only physician who testifies as to the merits of Moxie, was of the opinion that Moxie has a tonic effect, in his opinion, "due in part to bitter principles contained," yet Dr. Thompson, in his application for registration of trade-mark, said:

"The material to be covered by this trade-mark is a fluid resembling in color the usual extract of vanilla; has a bitter taste with an associate taste like common 'Tonic Beer.' The taste is from the flavoring extract. The base, or most useful part of this compound, is as tasteless as cornstalks."

The statements, therefore, that Moxie is a nerve food and a cure for paralysis, etc., cannot be supported upon the basis of any merit it may have by virtue of bitter principles which Moxie contains. The value as a nerve food and cure for paralysis is distinctly attributed to the supposed sugar cane like plant or simple starchy plant. This is what is referred to as "A little insignificant weed revolutionizing the habits of the world," and as "the richest predigested nerve food ever discovered." There is no claim by the complainant that the bitter ingredients of Moxie can justify the claims made for it.

Moxie was put up not only in liquid form, but in the form of lozenges. The statements concerning Moxie made in connection with these lozenges seem directly relevant to an inquiry into the true origin and ingredients of Moxie. Attention is called to the medicated Moxie Lozenges, respondent's Exhibit 37. On the box is the statement:

"The Moxie Nerve Food from which this Lozenge is made, has had the largest sale ever known in the history of trade, 5,023,741 quart bottles having been sold during the first fifteen months. * * * It is generally believed it has saved 228,000 drunkards, and 389,000 nervous wrecks during the last year."

This exhibit contains a printed sheet with the printed signature of A. Thompson, M. D.:

"288 Doses for 10 Cents.

"Will break colds, coughs, rheumatism, pneumonia and fever in their first stage. I used them 26 years for that purpose, in the largest practice in New England. After exposure, dose, one-eighth of a lozenge and wait. If an attack of rheumatism or pneumonia is treated, dose same every three hours until better. A. Thompson, M. D."

The date of this exhibit is not later than 1899. Subtracting 26 years from that date would throw the origin of Moxie back to 1873. This is not consistent with the statement in 1885 that it was lately introduced by Lieut. Moxie as a nerve food, and that it had been brought to Lowell and thoroughly tested for three months.

The defendants have offered in evidence other exhibits tending to show that Dr. Thompson was a writer of medical fiction, and an originator of marvelous discoveries, or, in other words, a manufacturer of several quack medicines. Public confidence is besought for the preparation upon the ground that it is a product of the medical knowledge and medical skill of an experienced physician. Moxie Nerve Food is presented to the public as the production of Augustin Thompson, M. D., "one of the most successful old physicians in New England." The qualifications and good faith of this expert are open to inquiry, and the inquiry is open whether Dr. Thompson's expert opinion as to Moxie was actually entertained or fraudulently stated. Missouri Drug Co. v. Wyman (C. C.) 129 Fed. 623.

Upon the complainant's brief it is stated that the complainant company had filled unsolicited orders for Moxie Lozenges, Moxie Catarrh Cure, and Family Safeguard. Assuming that the present complain-

ant is not responsible for any statements made as to "A Sunbeam" or "J. S. Q. Nerve Food," I think that the other preparations sold by the complainant are competent evidence.

Dr. Augustin Thompson was always connected with the Moxie business, and with the several owners, until his death in 1903, according to the complainant's brief. The brief states that in 1894, 10 years after the establishment of the business, 51,000 cases of 12 bottles each were sold; and in 1904, the year in which the bill of complaint was filed, 392,385 cases of 12 bottles each of Moxie were sold; and that the complainant produced in 1904 approximately 400,000 cases of Moxie. Thus, at the height of its business, after an expenditure of hundreds of thousands of dollars and of great efforts in advertising, the business had not reached the proportions stated upon the Moxie Lozenge box to have been attained within the first 15 months.

The defendants have also attempted to show by chemical analyses the nonexistence in Moxie of its advertised ingredient and qualities. The complainant has made a most elaborate and careful attack upon the analytical methods, and has devoted much testimony and argument to show the impossibility of an absolute analysis, either qualitative or quantitative, and the impossibility of determining from vegetable extractive matter the natural source or vegetable from which the extractive is derived. The defendants' chemists, however, are of known reputation and skill; and, while the analyses may not prove a negative with scientific certainty, they cannot be disregarded or dismissed as of no value. It is fair to say that, so far as careful analyses disclose, Moxie contains no ingredients which are recognized as of value as a nerve food or cure for serious diseases; that it corresponds in its composition with root or tonic beer, being composed principally of sweetened water and well-known flavorings, with indications of gentian and cinchona; and that it is practically devoid of predigested solids. Mr. Wyatt was of the opinion that the extractive bodies were a mixture of cinchona and some other bitter roots or plants such as gentian or chiretta or quassia, either of which give a similar taste.

While we may concede that the complainant has shown the possibility of the existence of a small amount of an unidentified agent of remarkable virtues, the probability that there is such ingredient, and that such ingredient corresponds to the various descriptions of it by the complainant, is very slight.

The defendants have also introduced the testimony of a large number of eminent physicians, who are of the opinion that the language of the label and wrapper of Moxie are untrue and deceptive. Among these are Drs. Edward Cowles, George F. Jelly, and John P. Sutherland, of Boston; Dr. George S. Adams, of Westboro, Mass., of the homeopathic school, who states that the preparation is inconsistent with the principles of homeopathy; Drs. William J. McCaw, George L. Shattuck, and Frederick T. Rogers, of Providence; and Dr. Eunice D. Kinney, of Revere, Mass. This evidence seems to me of great weight in determining whether Dr. Thompson did in fact have either the opinions or ingredients which he claimed to have, and whether the present complainant has acted in good faith.

The most liberal allowance should be made for difference of medical opinions. Moxie Nerve Food Co. v. Holland (C. C.) 141 Fed. 202. Conceding that a preparation which is put forth with honest claims may be entitled to protection though these claims are contrary to the weight of medical authority, and recognizing that this court should not sit as a court of medical inquiry to settle differences of medical opinion, we have the question of fact, does Moxie contain any such ingredient as it is represented to contain?

Dr. Frederick T. Rogers says:

"It is impossible, with the thousands of enthusiastic and educated men who are investigating and studying the medicinal virtues of the world's flora, that any one man should discover and appropriate to his own uses any plant which possessed in any degree the properties ascribed to the principal ingredient of Moxie without its becoming common knowledge, and there is not in materia medica any single or combined vegetable agent which possesses these powers."

This opinion, taken in conjunction with the statements of the Bolivian origin and the extensive use of the article as a national drink, seems to be reasonable. If in fact there is an article of general use which has so many of the beneficial properties of erythroxylon coca, and no detrimental qualities, it seems improbable that it should not have become known to materia medica.

Dr. Rogers further says:

"Any adequate knowledge of the complex nature of the nervous system of the human body, of the metabolism occurring in health and disease, and of the structural and functional changes which present to the clinician and pathologist in the diseases which it is claimed are cured by the use of Moxie, will absolutely controvert the statement that any food will cure the diseases specified, viz., cerebral softening, locomotor ataxia, or insanity, with their attendant structural changes. It would be quite as probable to assert that such a food would lengthen a leg shortened from tubercular hip-joint disease, would replace pulmonary tissue destroyed by a suppurative process, restore sight to an eye blind from atrophy of the optic nerve, or preserve the integrity of an organ the seat of a cancerous inflammation."

To meet this testimony of Dr. Rogers, the complainant has introduced in rebuttal the testimony of Dr. Richard T. Bang, of New York, who states:

"I do not believe that anything stated on the label is impossible, and if Moxie Nerve Food contains the proper ingredients it is also quite probable."

He criticises the statement of Dr. Rogers that there is no plant known in medicine which could possibly have the effect such as is claimed for Moxie Nerve Food, and states that he has personally known of a plant which grows in Brazil, and which is known as "Fedegosa," which contains a marked amount of nerve food known as "lecithin." He states that he knows it to be a physiological fact that lecithin is also found in all of the cereal grains, such as wheat, rye, oats, etc., and peas, beans, and lentils; and that it is also found in the cellular juice of many plants. He was of the opinion that lecithin itself possesses the powers ascribed to Moxie Nerve Food in its label and advertising.

Dr. Alfred H. Tuttle, of Cambridge, Mass., testified that he had used Moxie in many cases of nervous exhaustion, in conjunction

with other treatment, and in some instances practically it was the only treatment.   He was asked: ·

"From your observation, can you state what the physiological effects of Moxie are when exhibited in cases of nervous exhaustion?  A. It produces a mild evacuation of the bowels, and increases the flow of urine, and promotes the appetite.  It causes a mild sense of well being which is evidently of a tonic nature, because there is no after reaction which would come, in the sense of the question, from stimulation.   Digestion, assimilation, and nutrition are improved, and in the course of time there is a general improvement in the physical and mental conditions of the patient in many cases.   *   *   *   It tends to eliminate the waste deleterious products of the body, and secondly promotes the healthy reconstruction.

"I consider Moxie as a valuable adjunct in the treatment of all cases of nervous disorders caused by nervous exhaustion, and in many cases, is all the treatment, excepting rest, fresh air, and restricted diet, that is necessary."

The result of this is that one of the complainant's physicians is of the opinion that the statements made on the Moxie bottle are not scientifically impossible, though he gives no opinion as to the merits of Moxie; and that another physician, without a knowledge of its composition, has used Moxie in many cases of nervous exhaustion.

If we assume that the complainant has a reasonable basis for a belief that Moxie can accomplish or has accomplished what is claimed for it, there is force in the complainant's argument that we should not inquire too closely whether it acts as a specific which feeds the nerves or as a tonic and laxative which eliminates waste products of the body and thus effects the claimed effects.

In the patent law, if an inventor makes a machine that works, he does not lose his rights by a mistaken and erroneous statement of the theory or principle upon which it works.   On similar principles, if Moxie has such effects as it is represented to have, we might disregard as unimportant an inquiry into the way it works, provided there were room for a difference of opinion.   But, assuming that Moxie is believed by the complainant's officers to be all that Dr. Tuttle claims for it, this is no warrant for representing to the public that it has recovered brain and nervous exhaustion; also paralysis, softening of the brain, locomotor ataxia, and insanity when caused by nervous exhaustion; has recovered a host of helpless cases of paralysis, or that a tumbler full will break a recent intoxication in an hour; and does not detract from the value of the testimony of the eminent physicians who believe these claims to be without foundation and fraudulent, and who believe that the simple starchy plant is a pure fiction.

Even where a preparation is shown to have greater virtues than those of the falsely advertised ingredient, as in Worden v. California Fig Syrup Co., 187 U. S. 534, 23 Sup. Ct. 161, 47 L. Ed. 282, this is no excuse for misrepresentations as to ingredients.   In addition to the intrinsic improbability of the story about the sugar cane like plant, and the heightening of this improbability by the testimony of chemists and doctors, the defendants offer the testimony of a former employé which tends to show the nonexistence of this ingredient.

George P. Walker, who appears to have been intimately associated with Dr. Thompson for several years in the Moxie business, testifies that he continued the manufacture of Moxie six years, using a formula

given him by Dr. Thompson, and not using any Moxie plant. He testifies that the flavoring and the extract are distinct; that the flavoring is made from oils, and the extract is made from a formula which was given him by Dr. Thompson, and which he now has. Upon cross-examination this witness was apparently embarrassed by testimony given by him in 1888, while employed by the Moxie Company, when he said:

"The Moxie is the secret of the business. It is something with which I am not familiar."

Upon the complainant's brief it is said, in italics, of Walker's testimony:

"He says that this 'ingredient' as to which he testified in Philadelphia was the extract of the Moxie plant."

The record does not support the brief nor the contention that Walker then claimed to have used and seen the Moxie plant extract. In his former testimony he did not use the word "plant," but referred to the "extract" as made by a formula. In the present case, complainant inquired on cross-examination:

"X-Q. Then the ingredients which Dr. Thompson disclosed to you early in 1886 did not include any Moxie plant extract? A. No, sir.
"X-Q. Then in your testimony at Philadelphia in the Chase Case the Moxie which you said was the secret of the business about which you did not know anything was the Moxie plant extract? A. Yes, sir. I knew about the other.
"X-Q. What did this Moxie plant extract look like. A. I never saw the Moxie plant extract. My only information was from the circulars written by Dr. Thompson."

The testimony of this witness must be regarded with caution, as his statement as to the date on which Dr. Thompson communicated to him the formula is not consistent with his statement in 1888, and because it appears from a written agreement made in 1889, whereby he was given the exclusive right to bottle and sell Moxie Nerve Food in 24 states and territories for 20 years, that he was to purchase his "Moxie extract" and to use "Moxie extract as received from first hands." The "extract" referred to in this agreement, however, apparently contained all that was necessary to make the complete article, excepting sugar, water, sugar color, and soda water. There is evidence that Walker purchased ingredients in large quantities—juglans or butternut bark, gentian, and paradise seeds—for use in Chicago, so that it is perhaps true that some Moxie extract was manufactured in Chicago, as the witness says it was; and his statements that he was familiar with its composition, and that he purchased some of the "extract" and made some at Chicago, are not improbable under the circumstances. Other employés had no knowledge of a plant known as the Moxie plant, though it appears from one of them that Dr. Thompson drew money for the purchase of secret ingredients.

It is true that the positive testimony of Walker as to the nonexistence of the plant requires corroboration. This is found in the chemical analyses, in the opinions of a large number of physicians of the highest standing, and in the circumstances surrounding the origin of Moxie, as well as in the probabilities of the case.

I am of the opinion that the defendants have affirmatively proved that the complainant has misrepresented to the public the composition and ingredients of its preparation. But, were it doubtful whether the defendants had affirmatively established misrepresentations, yet an injunction could hardly be issued in this case. It is a familiar rule that an injunction will not issue to enforce a right that is doubtful. Consolidated Canal Co. v. Mesa Canal Co., 177 U. S. 296, 20 Sup. Ct. 628, 44 L. Ed. 777.

The complainant's right to protection of its trade-mark, or of its trade, is at least doubtful for these reasons:

It has introduced no evidence sufficient to show that its preparation contains any ingredient which warrants the name of nerve food, or that it is in fact a preparation of a plant such as is described in the declaration for trade-mark registration, and in the label and wrapper.

It has introduced no evidence which tends to show a reasonable basis for a belief that the statements which it makes as to curative powers "in brain and nervous exhaution, paralysis, softening of the brain, locomotor ataxia, and insanity, when caused by nervous exhaustion," are true, or that it "has recovered" a "host of helpless cases of paralysis," or that "a tumblerful will break a recent intoxication in an hour," or that it will cure paralysis caused "from malnutrition or overwear of the nervous system."

The complainant's evidence at best shows that Moxie is a mild evacuant and diuretic, with some tonic effect due possibly in part to bitter principles contained in it.

The defendants' evidence, on the other hand, establishes affirmatively a very strong probability that the statement that Moxie is a preparation of a plant corresponding to the complainant's description of it is pure fiction, and that it contains no nerve food or curative agent other than a small amount of bitters, such as gentian or cinchona. The possibility that there are other ingredients which have escaped chemical analysis, and that there may be an ingredient which in any respect conforms to the descriptions of its origin and nature, is altogether too remote for consideration in the practical administration of equity.

A dealer in bottled goods who is unwilling to swear to the truth of the representations it makes to the public, or to swear that its bottles contain what the labels say they contain, and who has it in its power to produce convincing proof if its representations are true, cannot expect a court of equity to come to its aid with artificial presumptions in its favor.

Upon the evidence, I am of the opinion that the defendants have been guilty of unlawful imitation of the complainant's trade-name and trade-dress, and have also been guilty of such unfair competition that an injunction should issue in behalf of a complainant who showed a right to equitable relief. I regret that this court is unable to protect the legitimate part of the complainant's business from the indefensible acts of the defendants.

In considering this case, I have not lost sight of the fact that a very large part of the demand for Moxie is based upon its merits as a

mere beverage without regard to its curative virtues; and I have carefully considered whether it might not be possible to protect this undoubtedly legitimate part of the business, while denying protection to what may be termed the medicinal part of the business. Such separation, however, is impractical, for if the plaintiff "has thought fit to mix up that which may be true with that which is false, * * * unless he establish his title at law, the court cannot interfere on his behalf." See Worden v. California Fig Syrup Co., 187 U. S. 530, 23 Sup. Ct. 165 (47 L. Ed. 282). The silence of the complainant on the vital issues, in the face of the strong evidence that its statements to the public are mere fiction and misrepresentation, cannot be satisfactorily accounted for as due to a desire to preserve a trade secret, for proof is required only of what already has been stated to the public.

The bill will be dismissed.